# Richmond

LEROY L. LAYNE V. COMMONWEALTH OF VIRGINIA.

November 22, 1954.

Record No. 4288.

Present, Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*Devany & Redfern,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Thomas M. Miller, Assistant Attorney General,* for the Commonwealth.

SMITH, J., delivered the opinion of the court.

The defendant, Leroy L. Layne, was arrested on a warrant charging him with violating Code, § 18-284,* by keeping or exhibiting a table used for gaming, and upon his trial the jury returned a verdict of guilty as charged in the warrant and fixed his punishment at six months confinement in jail and a fine of $250.00. The trial court overruled a motion to set aside the verdict as contrary to the law and the evidence and entered judgment according to the verdict, to which judgment we granted this writ of error.

The sole question for our determination is whether the evidence upon which the defendant was convicted is sufficient to establish his guilt beyond a reasonable doubt. The testimony of the witnesses was not transcribed but the facts of the case as certified by the trial court are in substance as follows:

On several occasions prior to September 26, 1953, two officers of the city of Norfolk vice squad had observed many persons coming and going from a storage room of Turner's Gulf Filling Station, located at 1001 Brambleton Avenue in the city of Norfolk. At about 11:30 p. m. on

---

*Code, § 18-284 provides:

"*Keeping gaming bank, gaming tables, etc.; seizure thereof; how disposed of.*—If any person keep or exhibit, for the purpose of gaming, any gaming table or bank of any name or description whatever or any table or bank used for gaming which has no name, any wheel of fortune or slot machine, or any pigeon-hole table or Jennie Lynn table, whether the game or table be played with cards, dice or otherwise, or be a partner or concerned in interest in the keeping or exhibiting such table or bank, he shall be confined in jail not less than two nor more than twelve months, and fined not less than one hundred nor more than one thousand dollars. Any such table, bank or wheel of fortune and all the money, stakes or exhibits to allure persons to bet at such table, bank or wheel may be seized by order of the court, or under warrant of a justice of the peace, trial justice (other than a civil and police justice) or the clerk of a trial justice, and the money so seized shall be forfeited, one-half to the person making the seizure, and the other half to the Commonwealth, and the table, bank, machine or wheel shall be burned; provided that when any billiard or pool table or other paraphernalia, not inherently gambling paraphernalia, is so seized, the court may, in its discretion, award the same to some charitable organization or war recreation center, upon condition that it be used only for the purpose of recreation."

September 26, 1953, after observing the filling station from across the street, the two officers obtained a warrant for the purpose of searching the station. After the officers knocked at the storage room door, it was opened from the inside, and when they entered the room they found in progress a "crap" game, a gambling game played with dice. The game was being played on a blanket-covered 4' x 4½' table, around which stood eight men.

The defendant was sitting at one end of the table and as the officers entered the room he reached into the center of the table, where there was a considerable amount of paper money in addition to some change, and took a piece of silver money which he dropped into a small pasteboard box on the table in front of him. Then when someone yelled "Police", the defendant got up from his seat and stepped away from the table while the other eight men grabbed the paper money on the table.

The storage room was small and triangular in shape with one steel barred window about eight feet above the ground in the rear wall and one door over which was a glass transom covered by a piece of oilcloth. There were some soft drink crates, service station supplies and a cot or bed in the room.

The officers confiscated the table, the blanket, a pair of white dice, which were lying on the table, ninety-five cents in silver, which remained in the center of the table and the pasteboard box, above mentioned, and its contents consisting of one pair of red dice and $16.95 in silver.

Four of the men who were found participating in the game testified that the game was suggested by someone other than the defendant, that no person made any profit from the game other than what he won at betting, and that the defendant's participation in the game was not different from that of any other player.

The defendant, who admitted five felony convictions, testified that as manager and bookkeeper of the service station, which was owned by a person named Turner, he was at

the station off and on at all hours of the day and night but that some other person was in charge of each eight hour shift. He also testified that on the night of his arrest he had been working on the service station books but was not on duty when another person suggested the game. He admitted participating in the game as a player but denied operating or exercising any more control over the game than any of the other eight players, who were fined $5.00 each for their participation in the game under an ordinance of the city of Norfolk.

The statute under which the defendant was prosecuted, § 18-284 of the Code of 1950, appeared as § 3815 of the Code of 1887 and provided "If any person keep or exhibit a gaming table commonly called A, B, C, or E. O. table, faro bank, wheel of fortune, keno table, or table of the like kind under any denomination, whether the game or table be played with cards, dice, or otherwise, or be a partner, or concerned in interest in the keeping or exhibiting such table or bank, he shall be confined in jail not less than two nor more than twelve months, and fined not less than one hundred nor more than one thousand dollars." This language was continued in the statute until it was amended and re-enacted as § 4676 of the Code of 1919, which amendment contained the identical language used in the present statute except for amendments made by Acts 1920, c. 409, p. 597, Acts 1924, c. 284, p. 414 and Acts 1944, c. 323, p. 474, which are not material to this proceeding.

Although the language of Code § 18-284 pertinent to this case has been in the Code since 1919, no case has been found in which it has been applied or construed. Prior to the changes made in the Code of 1919, it was held in *Commonwealth* v. *Wyatt*, 6 Rand. (27 Va.) 694; *Huff's Case*, 14 Gratt. (55 Va.) 648, and *Nuckolls* v. *Commonwealth*, 32 Gratt. (73 Va.) 884, 895, that the distinctive feature of the enumerated games was that "the chances of the game are unequal, all other things being equal, and those unequal chances are in favor of the exhibitor of the games

or tables," and therefore in order to sustain a conviction for the keeping or exhibiting of a "table of the like kind" with those specified in the statute this element of unequal chance in favor of the exhibitor had to be proved. *Cf. Lewis' Case,* 115 Va. 962, 80 S. E. 575.

Under the present statute it is no longer necessary to prove one of the enumerated games or that the table is of "the like kind" as provided in the former statute, but in the language of the Code revisors, the statute has been made "more comprehensive," and now it is an offense to "keep or exhibit, for the purpose of gaming, any gaming table or bank of any name or description whatever or any table or bank used for gaming which has no name." The words "keep or exhibit" as used in the statute have no technical meaning but simply mean to maintain, control or display. The display or maintenance of a table for the purpose of gaming by one having authority and exercising control over it constitutes a keeping and exhibiting within the meaning of the statute. · It is immaterial therefore whether a particular table is specially constructed or designed for the purpose of playing the game called "craps" or any other game for money or property, so long as it is *used* for the purpose of gaming.

In order to constitute "gaming" within the meaning of § 18-284, it must be proved that there was betting or wagering of money or something of value upon the result of some game or upon the happening of some event. *Lescallett* v. *Commonwealth,* 89 Va. 878, 17 S. E. 546; *Shumate* v. *Commonwealth,* 15 Gratt. (56 Va.) 653; 9 Michie's Jur., Gaming and Gaming Contracts, § 4, p. 146; 24 Am. Jur., Gaming and Prize Contests, § 19, p. 411; 135 A. L. R. 104. See, however, Code, § 18-289, which makes the offense of "gaming" as provided in the two preceding sections complete without proof of betting or wagering.

The aim of § 18-284 is to discourage gaming in its inception and its violation depends upon whether the accused kept or exhibited any table used for the purpose of

gaming. This statute provides for an offense distinct and separate from that of merely participating as a player, Code, § 18-278, or that of knowingly permitting one's premises to be used for gaming, Code, § 18-285. Hence, we must determine whether the defendant kept or exhibited a table, without regard to its adaptation to any particular game, for the purpose of gaming.

By showing that the defendant took some silver money from the table and dropped it in the box in front of him, the Commonwealth undertook to show by inference that the defendant was taking a "cut" or profit and therefore keeping or exhibiting a table in violation of the statute. While this is evidence of guilt under the statute it is not conclusive for it may also be inferred that he was making change or was taking from the table money which he had won as a player. Furthermore, the mere fact that the officers observed several persons going to and from the storage room on other occasions, without more, is not sufficient to establish the fact that gaming was frequently or even occasionally practiced therein. Likewise, the fact that the defendant was manager and bookkeeper for the owner of the service station does not establish beyond a reasonable doubt that he was the exhibitor or keeper of the table on which the game was being played, because it is undisputed that someone other than he was in charge of the station, not only at the time in question, but also during each eight hour shift. Moreover, there was positive evidence that the defendant's participation in the game was no different from that of any other player and no witness testified that the defendant exercised or asserted any control over the game or the table, which was not shared by the other players. The guilt of a party is not to be inferred because the facts are consistent with his guilt; to prove guilt they must be inconsistent with his innocence.

At most, the evidence shows only that the defendant and eight other men were betting or wagering upon the results of a game called "craps". Therefore, the evidence,

both direct and circumstantial, on which the defendant's conviction is sought to be established does nothing more than create a mere suspicion of guilt, which alone is not sufficient to uphold a conviction of crime, because it is a well settled rule of the criminal law that the evidence must exclude every reasonable hypothesis other than that the accused is guilty. *Hairston* v. *Commonwealth*, 97 Va. 754, 32 S. E. 797; *Wooden* v. *Commonwealth*, 117 Va. 930, 86 S. E. 305; *Keeton* v. *Commonwealth*, 152 Va. 1036, 148 S. E. 783; *Patterson* v. *Commonwealth*, 165 Va. 734, 181 S. E. 281; *Castle* v. *Commonwealth*, 196 Va. 222, 83 S. E. (2d) 360; 7 Michie's Jur., Evidence, § 35, p. 368.

For the reasons stated the judgment appealed from is reversed and the case remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*